Good morning, Your Honor. I'm Russell Frackman. I represent Perfect 10. I would like to try to reserve about six or seven minutes for rebuttal, if I may. Your Honors, I would like to commence, with the Court's permission, with what we believe to be the three legal errors involving the full-size images that the Court committed. As the Court knows, those are the images with respect to which the District Court denied our motion for preliminary injunction. And we think that there were three distinct legal errors committed, any one of which would be dispositive in our favor. The first one is the Court's construction or failure to heed the language of the display right as it is set forth in the Copyright Act. The second one is the District Court's failure to find that Google had the ability to control its own index and database, and therefore its failure to find vicarious liability. And the third one, Your Honors, is the Court's failure to find that Google contributed in many different ways to the underlying infringement, and therefore the District Court's refusal to find contributory infringement. So if I may, I would start first with the display right. And this is actually a very simple argument. The District Court, in defining the display right with its server test, simply ignored, indeed, as we pointed out to the Court, never even cited the definition in the statute, that definition being to display is to show a copy either directly or by means of a film, slide, television image, or any other device or process. And as we pointed out to the Court, it's clear from the legislative history that when Congress passed this brand new right in 1976, it did so intending it to be a broad right and intending it to cover any future technologies, including specifically computer technology. And that device or process, Your Honors, that Google implemented here to show the images, indeed, as the Court knows, infringing images, is simply inline linking. And I think this becomes apparent from this Court's definition of inline linking in Kelly 2. And if I may, just briefly, inline, the Court said at 336F3 at 816, inline link a graphic from a source website and incorporate it in one's own website, creating the appearance that the inline link graphic is a seamless part of the second web page. The inline link instructs the user's browser to retrieve the link to image, instructs the user's browser to retrieve the link to image from the source website and display it, that's this Court's language, on the user's screens, but does so without leaving the linking document. Thus, the linking party can incorporate the linked image onto its own content. I would submit to the Court that there cannot be a clearer definition of display than what the Court described inline linking to be. Your Honors, this is where I was about to point to my easel, but if I may, I'd just like to refer the Court to some exhibits in the record, which I think display this issue clearly. As the Court knows, when someone, a Google user, types in the name of a model or a search term, thumbnails are returned. And that's ERG1030. That's what the District Court's reasoning is. In the inline server test, Google was copying and serving those images. However, when one of those images is clicked on, the user does not go to the underlying website. The user goes to a second page on Google. And that's ERG942, for example. And here's where I would submit to the Court there is a great anomaly that illustrates the fallacy in the District Court's reasoning. As the Court knows, on that second page at the very top, there is a thumbnail image, the same one that was clicked on. That is an infringing display under the District Court's server test. The large size image right underneath it on the same page displayed to the same users at the same time is not an infringing display. And I would submit to the Court that that simply runs counter to what Congress intended to do and what is fully supported by the legislative history that we've quoted. I would also point out to the Court that that second page isn't necessary for any search function. It's only necessary to keep a user at Google. And that second page, in addition, frequently, as in ERG942, has ads. They call them ads by Google, with long series of O's, which shows exactly why Google wants to display those images. Ms. Laird. When I type a URL into Netscape or Safari, and it brings me to a website, is that displaying that website, my browser? With Netscape, Your Honor? Right. Something like that. Yes, indeed, it is. But Netscape, as discussed by this Court in the Napster decision, Netscape created a very narrow exception to direct liability. Indeed, we think that a comparison of Netscape to our case shows why this is a display, an infringing display. What Netscape said is when you are a backbone to the Internet, when you hook somebody up to the Internet and you do not volitionally do anything, you merely accept as a repository anything that users supply, you will not be committing volitional acts and therefore ought not to be liable. As Netscape said, if we hold Netscape liable for doing that, we hold the entire Internet liable. That is not what Google does. Google does not receive material. It goes out with its proprietary algorithm, searches out the material, reformats the large-sized images to the small-sized images, indexes them, organizes them, decides what to return, when to return, how to return it, and then, Your Honor, uses those images to take you to the second page on Google. It is everything that Netscape is not. It is acting clearly volitionally, and I would simply point the Court again to the definition of in-line linking that I read to the Court. If that's not a definition or a description in a volitional conduct, then I'm not sure what would be in this context. So I think the Netscape decision actually supports us because it shows what would not be volitional. If Google, for example, accepted images from users, I'm sorry, from websites who wanted to be indexed in their image search, just the way they do for their video or claim to do for their video search, that would be something different. But they don't do that. They go out and they get images, and what they're getting, by the way, Your Honor, are not images from our client. They don't direct users to our client. They're getting infringing images from infringing websites located throughout the world that would not have the opportunity to be viewed by millions and millions of users without Google's affirmative actions in doing so, which brings me actually to my second point, which is the secondary liability point. If the Court agrees with us on direct liability, then it need not reach, of course, secondary liability. However, I'd like to point out very briefly the district court's errors in that regard. As the Court knows, the district court found that there was, as to vicarious liability, a clear financial benefit. So the issue really is control. And here's where the Court went wrong by believing that what Google had to control was the entire Internet. We never asked for that. That, of course, is an impossibility. It makes liability impossible under these circumstances. What we asked Google to do is exactly what this Court asked Napster to do, and that is to control its own index and its own database. They don't have to go out on the Internet to stop committing infringement. They just have to go to their own index and delete infringing images before they are shown. They just have to go to their own index and to their own sites again. That's exactly what this Court said in Napster at, among other places, page 1023. The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise, citing this Court's opinion in Fonovisa, the two main cases on secondary liability. The premises that we're talking about are Google's premises. It's Google's index. And they have admitted, we've cited this to the Court, that they have the ability to control that. In fact, that's their business. Kagan. Would the DMCA provide Google with a safe harbor for this, against this secondary liability? We believe not. Of course, the district court did not reach that issue, as Your Honor knows, because finding no liability had no reason to reach that issue. But we believe as a matter of law, and based on the record here, the DMCA would not provide Google a defense for a variety of reasons. Google, as Your Honor knows, invoked only Section 512D, the, the search engine safe harbor, information location tool, it's called. But here, Your Honor, there's no search function being performed. The functions under the DMCA, as Your Honor knows, have to be considered separately and independently. If you look at the first page of what Google does, the thumbnails, those take you, as I pointed out to the Court, to a second page. They don't take you to an underlying website. They don't, they take you back to Google. The second page serves no search function. It replaces the underlying website. And in fact, what Google has become is simply an infringing website, like any other website. Half of the, when you got to the second page, that the half that showed the original or the infringing website and not... The bottom half was, was framed and linked by Google. But it is, it isn't Google. It's the, the infringing website. Well, that's a, I suppose that's, it's a question of definition, Your Honor. You are, you are tethered to Google. The top part is Google. You've never gone to the infringing website except in a, perhaps a mere technicality, which is where the District Court went wrong. It elevated the, the technical issue of where the image is coming from with the, and, and ignored the practical issue, which is that the image is being displayed to a user who types in Google.com, stays on Google.com, and never goes anyplace else, and is shown both the small images and the large image. And if I may, with the, the other minute or two remaining, discuss briefly contribution, another basis, another area where we believe the District Court erred. And again, here too, the Court found or assumed in our favor knowledge, one aspect, and then found that there would be no contribution. But District Court again said an insurmountable, an insurmountable obstacle to contribution here. What the Court basically said, as one of our amicus pointed out, is that there had to be a but-for causation. In other words, the infringing websites would have to rely on Google for their very existence in order for Google to contribute. And that is simply not what this Court has held in Fonovisa and in Napster. The definition that this Court adopted, which is essentially the universal definition of contribution, is anyone who encourages or assists the infringement. And we pointed out to the Court the numerous ways that the infringement is assisted, perhaps the most obvious being that there is no dispute that the underlying infringing website that is being framed is infringing. And how is Google assisting that underlying infringing website? It's giving it the audience of the third most trafficked destination on the Internet. It's giving it eyeballs. It's giving it the draw, exactly what this Court described in Napster. It's giving it ads. It's giving it to the extent a user goes anyplace, additional traffic. And it's providing its audience and it's providing an audience to the underlying website. And that's all done, Your Honor. It's all done by what Google does in preparation for that, going out to these websites that likely would not otherwise be found, pulling back their images, reformatting them, and providing the ultimate large-size picture. And it does that, Your Honor, and I would submit that this seals the evidence of contribution. It does that, Your Honor, as we pointed out, Your Honors, even without the underlying website knowing about it. The underlying website doesn't have to know about it. It may not even be displaying that image anymore. So I guess I'll end where I started, which is, what better evidence could there be that Google is displaying that the underlying website doesn't even know what's going on? Okay. You have a little over four minutes for rebuttal. Thank you for your argument. Counsel? Good morning, Your Honor, and may it please the Court. Andrew Bridges for Google, Inc. I must save some time for Amazon's counsel to argue. I would also like to save two minutes for rebuttal on the cross-appeal, if I may. Sure. First, I will discuss the fair use issue on the cross-appeal, and then I'd like to respond to some of the points that Mr. Frackman made. The district court in this case ruled against fair use in a context where Google provides a remarkably useful, comprehensive, general-purpose search engine, and one that relies upon a thumbnail index, just like the one approved by this Court in Kelly v. ArribaSoft. The district court granted an injunction despite a number of remarkable findings in Google's favor. The district court enjoined Google, despite its finding of fact that Google's use was highly transformative, the supplemental record, I guess the record at 1294, despite the finding of fact that Google provides an essential source of vital information, despite the finding of fact that Google does no good no more than was necessary to achieve its objective of providing effective image search capabilities, despite the district court's misgivings about the effect of the injunction on the Internet, and despite the district court's recognition of Google's immense value to the public. The district court's opinion in general was very thoughtful in many ways, remarkably thoughtful, but the district court made three specific errors in its fair use analysis that called for reversal of the injunction. And the three errors relate to the first factor of fair use, namely the purpose and character of the use, the fourth factor of fair use, namely the effect of the use on the market value of the original, and most importantly upon the way the district court synthesized its conclusion regarding fair use. On the first fair use factor, as I noted earlier, the district court found Google's use to be highly transformative. And then the district court analyzed supposed commercialism of Google's search. That finding was wrongful in two different ways. First, the district court acknowledged, and it was at 1291, that the use that's relevant in fair use is the use of Google's search engine, not third parties. Here, Google's use was search. The commercialism came in because of advertising that Google places on websites throughout the web. No advertising on Google image search. The district court thought that Google's commercialism by placing ads on third parties was commercial. The district court found that that made Google's image search more commercial than the image search in Kelly v. Ariba. But this court noted in Kelly v. Ariba at pages 815 to 816, that in fact, Kelly's image search had advertising. It was Ariba Soft's image search. But there was advertising in Ariba Soft search. But most importantly, the district court focused on an unrelated advertising campaign to call Google image search commercial. But the most important error the district court made on this factor was the fact that in Camel v. Acuff-Rose at page 579, the Supreme Court teaches that the more transformative the use, the less important other factors such as commercialism become. The more transformative the use, the less important the other factors become. Well, the district court here allowed the commercialism finding to trump the finding of fact that Google search was highly transformative. So the district court got the Camel teaching precisely backwards in its first fair use analysis. And that was its first error of law. The second error was on the fourth factor, the effect of Google's use on the marketplace. Here the district court did make a mistake by looking at alleged hypothetical uses by consumers with cell phones. There's nothing in the record that said consumers were actually using cell phones to download Google images. But the district court felt that common sense might dictate that persons with cell phones using Google browser might use Google instead of getting images directly from Perfect 10. But this violates the principle I mentioned earlier, that in analyzing fair use, one looks at the use of the party being challenged, not third-party uses. As a matter of fact, the Supreme Court in Sony v. Universal City Studios said at page 446, and I quote, third-party conduct is wholly irrelevant in an action for direct infringement. Well, this was a claim for direct infringement. The district court wrongly looked at some hypothesis about what users might do to charge Google with supplanting the market for Perfect 10 images. Other cases that support this are, well, actually, let me get to a second point. The district court also wrongly looked at that third-party licensing market. The licensing market that should have been evaluated by the district court was whether there was a potential or actual licensing market by Perfect 10 for this use in this case. And the Second Circuit has had several cases on that most recently, or the Bill Graham case is important on that. One looks to see, has Google gone into an area where Google should have taken a license or where there is a potential of a license to Google? There is no such potential. Harper and Rowe puts it another way, has somebody engaged in a commercial activity without paying the customary price? Well, Google has not paid the customary price. There is no licensing market for search engine results. So that was another error. But the biggest error on fair use was in the way the district court synthesized its conclusion over fair use, synthesized the factors. And I'd like to quote from the district court. Although the court is reluctant to issue a ruling that might impede the advance of Internet technology, and although it is appropriate for courts to consider the immense value to the public of such technologies, existing judicial precedents do not allow such considerations to trump a reasoned analysis of the four fair use factors. Well, in fact, in Campbell v. Acuff-Rose, the Supreme Court made it clear that, first Harper and Rowe, the Supreme Court made it clear that the factors are not to be mechanistically applied. Campbell v. Acuff-Rose teaches that the courts are to look at the factors flexibly and to view them in the light of copyright's purpose, which is mainly the promotion of the progress of science and useful arts. Here the district court sounds apologetic that its mechanistic calculation of the factors under what it believes were existing judicial precedents would not allow the considerations that are essentially the grand copyright considerations to trump the analysis. Excuse me. I'm sorry. Well, are there cases or what are the best cases for saying that the court could have allowed its assessment of public benefit of the Google functions to outweigh the four factors or its more detailed weighing of the four fair use factors? Is there a case that would assist you on that point? Well, I don't think. Your Honor, I'm not sure that there would be such a case, because I don't, outside of this case, I'm not sure that I've seen a case that pits the public benefit against the four fair use factors. The four fair use factors are equitable. They are meant to be a heuristic device by which the court comes up with the grand conclusion. So I would not suggest that there is some external public benefit. These are all guides. They're non-exclusive under the statute and equitable under the cases that help guide a court to look at the big picture, which is the promotion of progress of science and the useful arts. Because fair use is not an embarrassment to copyright. It is not a threat to copyright. It is indeed the fulfillment of copyright, because fair use has long been thought, as the Supreme Court said in Campbell at 575, from the infancy of copyright protection, some opportunity for fair use of copyright materials has been thought necessary to fulfill copyright's very purpose, to promote the progress of science and the useful arts. In this case, because the district court erred on two critical factors, the first and fourth factors, and because it erred in its synthesis, its entire conclusion was error and should be reversed. I would like to move on to a couple of the other issues to make sure that I respond to Mr. Fragman. Perfect Ten has conceded that volitional conduct is required for financial direct infringement. What's interesting is that Perfect Ten tries to distort the facts to make Google's conduct look highly volitional. And we respond in detail on page three and later in the brief. I'll direct the court to that rather than taking time on it here. But we must bear in mind that Google is a general purpose, highly automated search engine that makes vast amounts of information available from the Internet. And it does not single out Perfect Ten. It does not single out infringements. It does not even single out one type of media. Anything that is available on the Internet is embraced within Google's search. Now, the question is whether there is an implication of the display right here. And frankly, the district court's opinion was outstanding on the display right, very thoughtful. It did tend to address only the cases which do support Google entirely. And it addressed the important public policies and sound judgment as to why the display right should not be implicated here. I admit that the district court did not specifically address the statute, did not specifically address the legislative history, but both, in fact, support Google here. Because the statute defines displaying as showing a copy. Now, Perfect Ten focuses on all the different types of methods by which something may appear or the image may be generated. But what Perfect Ten failed to focus on is that to display a work means to show a copy. And the question here is who is causing the display? When a website appears on a browser, to answer Your Honor's question, it's not Netscape, it's not Dell, it's not something that might appear around a website that is displaying. It is the source website that engages in the transmission. And anybody in that path of transmission to the user, those are the ones who display. Google is outside that path of transmission. Google is the card catalog. And the card catalog is not necessarily furnishing the book, even though the card catalog tells you where you can go find the book, so that the user, by activating the browser, by clicking the link, the user receives the transmission from the website. It is the website that displays. So the statute is clear that it has to be to show a copy. I notice that plaintiffs and people on that side like to say, well, it has something to do with you can help bring about, ultimately cause, that the statute doesn't put anybody in a chain of causation responsible for the display. The electric company is not responsible for the display, without which there would be no picture. The party that's responsible for the display is the party that either serves the content, hosts the content, or transmits the content, and Google just doesn't do that. And frankly, under their line of reasoning, all hyperlinking would be liable under the display right, and that would be a disaster for the Internet. Because in our case, a framed hyperlink is a little different from a regular hyperlink. In both instances, you click on the link, and you get a new page. You do that with a straight hyperlink, the new page fills the screen. You do it with a framed hyperlink, the new page fills part of the screen, and there's still something left from Google on top. Well, if regular hyperlinking is not an implication of the display right, which they concede and the MPAA agrees, if that's not an infringement, then when it's framed, you can't turn it into an infringement just because Google has placed its own content at the top of the page. You can't turn something from not a display into a display by the fact that Google has added a separate frame at the top. I wonder about secondary liability in that context. If Google is informed that that page, that website, source website, is an infringer, and Google would be able then to suppress access to it, can you discuss why that doesn't raise the contributory liability issue? Well, yes, Your Honor. First, in this case, Google regularly does take down its links upon notice. It regularly does. And it has done so not because it has to necessarily. In the district court below, when there was no finding of contributory or vicarious liability for this, Google has continued to respond to DMCA notices, even though there was a finding of no secondary liability. So it's Google's practice to take it down. But still, there would be no liability because if you step back and look at how secondary liability has developed under the law, it's developed in two different ways. It's two different ways of answering the same question, when is person A responsible for the acts of person B? And vicarious depends upon a special relationship, whereas contributory depends upon special conduct. In vicarious liability, this court in Fonovisa and Napster have followed and never departed from the Second Circuit in Shapiro, Bernstein, and Gershwin, both of which were acknowledged by the Supreme Court in Sony, that on vicarious, the special relationship originally was something like respondeat superior or principal agent. And what was always clear was that landlord-tenant never became the type of relationship. So for vicarious, it is almost like a joint enterprise. Just some detached, distant relationship has never counted. And the Supreme Court in Meyer v. Holly, in a different context, Housing Act context, made it clear that in a federal statutory tort scheme, such as copyright law, it is improper to expand vicarious liability beyond traditional forms without congressional authorization. So this court has found vicarious liability only when there really is some remarkably special relationship between the two parties. That doesn't exist here. Now, on contributory, it depends upon special conduct, a special type of conduct. And going back to the Second Circuit, it required pervasive participation in the conduct amounting to the infringement. And this court's never varied from that, and this court has always gone back to Shapiro, in the Napster 2 case. The phrase at page 1019 was the defendant has to engage in personal conduct that encourages or assists the infringement. Going back to first principles, Google is a general purpose, vast, automated system. It is not designed to focus on perfect ten, on infringement, anything. It reflects what is out there. That is not the kind of conduct that is, that provokes liability for, contributory infringement liability for infringements by others. Napster 2 also had the language that if a party learns of specific infringing materials and fails to purge it, the operator knows of and contributes to the direct infringement. That's right. There was very, very specialized knowledge in Napster from a variety of reasons. First of all, Google has regularly taken down links based on, based on notice. But in this case, there, first of all, Sony versus Universal City Studios, as acknowledged by Napster, has never made somebody liable for generalized knowledge that may be used for bad things. And then second, is there specific knowledge based on notices? Well, in this case, Your Honor, there have been very, very defective notices. Google has always taken down what it can figure out to take down based on extraordinarily bad notices in this case. I need to leave time for Amazon. I've used up quite a bit of time. I do need to reserve a little time for rebuttal on the cross appeal. But I did want to point out also on the display issue, the two amicus briefs by the Electronic Frontier Foundation and Net Coalition had pages that we couldn't use that, that really explain in detail the propriety of the fact that display is not implicated here. And I do commend those to the Court. The amicus briefs were quite helpful. Yes. On both sides. We'll hear from Amazon now. Mr. Jansen. Good morning. Mark Jansen for Amazon.com. I noticed that Mr. Frackman didn't mention Amazon's name during his argument, so perhaps he is not so concerned about what Amazon does. But Mr. Bridges has covered, I think, very well the issues of fair use and whether the court's server test for direct infringement was appropriate and whether it was the right test. I think the big picture here, and obviously I understand the Court is very well aware that the judge in this case found that Amazon is in a very different situation than Google in the context of providing image search results. Number one, as we pointed out in our brief, and this really is not necessarily pertinent to the record of the Court's decision, but Amazon was being provided image search results by contract from Google. So Amazon, as the Court found, does not crawl the web, does not index the web, it does not store or copy any images, thumbnail or otherwise, on its servers. It simply acts in an automatic capacity if a user is on an Amazon site and wants to conduct a search using its browser, the user using its browser, inputs whatever the search term is. That search term goes through the Amazon server. It's transmitted to Google. Google then, under its contract, sends back responsive links using the Google logic for basically sorting search requests. That comes back through Amazon and it goes then unaltered, those URLs, the instructions to allow the user's web browser to access and call up the equivalent of sending instructions to a car so that car can then travel to a store to get or to a library or to a bookstore to get what it wants. Amazon no longer has that contract with Google. So that contract ended in March. We let the Court know about that in our papers simply so the Court would be aware of the change in circumstances. I don't think it really necessarily impacts how the Court should rule on the merits of this case, but the Court should know, as the Court below found, and I think its factual findings are entitled to great weight and should be honored, that Amazon is a purely passive participant in relaying search requests through itself to Google and then transmitting back, unaltered, the signals or the instructions that allow the user's browser to then access and pull up whatever materials that user has asked to see. So I think the big picture here is I think this goes to the fair use argument quite a bit is, and it's very important to keep in mind, is that the Internet is really a modern town square. You know, it's a forum for public debate as well as for commerce. And it's grown phenomenally. At this point there are estimated to be 100 million websites out there. It's like a small world. Each of those websites has multiple pages. So it's a virtual world that would be inaccessible and we would not be able to find it if we did not have search technology such as provided by Google and others like Yahoo. That's a very important thing to keep in mind because the rule that's being sought here by the plaintiff is a rule that would very much limit the ability to, for researchers to find sites, to find that world that's out there and get directions on how to go there. I think the court below had that concern very much in mind when it went through its detailed analysis and, for very good policy reasons, articulated a server test, which I think is, as Mr. Bridges pointed out, completely consistent with the legislation, with the statute, with 106 and 101, which says specifically that obviously you can't be liable unless you actually copy an image. You can't be liable unless you distribute that image. You can't be liable unless you cause the display of a copy. And a copy is defined in Section 101 as a physical thing that is stored in some fixed media. You cannot, under the Act's language itself and the legislative history, which has been pointed out by Amicus as well as us, you cannot display a copy unless you have a copy. You've gone about three minutes over your side's time. You can continue to argue, but I want you to know I'm going to give that time to the other side, whatever you take. That's fine, Your Honor. I think we've covered the waterfront here. I believe that the court's findings really, the whole gamut of what the court's findings were, went to contributory infringement, went to the lack of control, went to the vicarious liability and secondary liability, contributory liability issues. I think those findings should be respected by this Court as factual findings, which they are. The only real legal argument, I think, or legal decision, was the Court's decision regarding what is the scope of direct infringement. The server test is appropriate, and the NETCOM case, I think, also would support the notion that any system like the Google search engine, but certainly the Amazon system, is an automatic system that is completely content neutral. It's not used as a, quote, infringement machine. It's not like a Grokster. It's not like a Napster or an Amester, which were systems that were set up specifically to, and were marketed to, allow people to copy. That was the whole purpose of Napster. That was the whole purpose of Grokster. So these cases are very much different from the situation we have here, where, as a very minor and virtually minuscule, in fact, the court found there was no evidence that any user had actually used these systems to infringe copyrights. A completely different situation that would not indicate that secondary liability is appropriate. Okay. Okay. One last thing, which I do want to point out, is that Amazon did submit evidence that it's entitled to safe harbor under 512A of the Digital Millennium Copyright Act. The court, below, didn't reach that issue, but we believe there was undisputed evidence actually supported by the court's findings that would make us immune from liability under that statute  Okay. Thanks very much. Thank you. Rebuttal? Put eight minutes on the clock. And you don't have to use it, but you've got it. I fear I might use it, Your Honor. Does the extra time include Mr. Bridges' rebuttal time? I'm going to give him about a minute, so go right ahead. A lot to say, but I think, let me put my whole response in context. Your Honors have heard both Google and Amazon argue about the Internet and about search engines, but this case is not about the Internet and it's not about search engines. It's about one function that makes infringing copies from infringing websites and displays them. This case is not about the end of the Internet. It's not about the end of Google. It's not about the end of search engines. It's about an aspect of their business that infringes copyright and that is essentially putting our client out of business. Your argument is if Google had a section called Google Audio that allowed people to download music, the fact that they do all of these other things wouldn't, shouldn't dissuade a court from focusing on music. You can't justify infringement by telling the court how much you don't infringe. You can't append an infringing, infringing conduct to non-infringing conduct and justify the infringing conduct, especially when it's volitional and avoidable. This court actually alluded to that in the Napster opinion, where Napster argued, gee, we're doing a lot of good stuff here. We're providing an access for new bands. We're doing other things like that. And here's what this court said at 1019, permissive reproduction by either independent or established artists is the final fair use claim made by Napster. The district court noted that plaintiffs did not seek to enjoin this in any other non-infringing use of the Napster system. We don't intend to enjoin any other non-infringing use of the Google system, Your Honors. Now, while I'm at that point and at the risk of skipping over for the moment Amazon again, on the fair use issues, I'm glad that Mr. Bridges referred to the findings that the court made findings supported by the evidence that three of the four fair use factors supported Perfect Ten and that the fourth factor was neutral. And putting all of those together, despite his reluctance, and I agree, there was reluctance there, and perhaps it's because I didn't explain it properly to the district court, despite his reluctance, he said that Your Honors know the burden on us to prove fair use. And in terms of public policy, Your Honor, I agree that there is no case that says, and as Judge Matt said, public policy does not trump the fair use factors, but I would submit to the court that public policy doesn't support Google anyway. As Mr. Bridges said, the public policy behind the Copyright Act is to foster creativity. How do you foster creativity in someone like Perfect Ten when you take all of its images and put them up for free and drive it out of business? You are doing just the opposite. Public policy in this case favors us. All we're asking the court to do is to Does the record support your statement that Google and or Amazon put up all of Perfect Ten's images? Well, what the support is, that was a little hyperbolic, Your Honor, but what the support is, but only a little, only a little, because what the support is, is Dr. Zade's uncontradicted declaration that says that they put up the best of Perfect Ten's images. And as the court knows, and those numbers are in our papers, it's something like 1,500 images. That's fine. Your admission of hyperbole answers my question. But are you talking about thumbnails or the full-scale, the full-size images? On the fair use issues? Right, because the district court was addressing the thumbnails. The district court was addressing the thumbnails, but I would submit to the court that, I don't know what the right Latin word is, a priori, if the thumbnails are not fair use, and if this court finds, as we ask, that there is a display of the large-size images, then the thumbnails cannot be fair use. The right word would be a fortiori. A fortiori. Thank you, Your Honor. I always learn something when I come to the Ninth Circuit. Amazon, if I may, for a moment. Oh, one other thing. Let me go back to the large-size images at the risk of jumping back and forth. Mr. Bridges said something very interesting. He said, showing a copy is, who is causing the display? Well, that's precisely right. Who is causing the display here? It's Google that's causing the display. It's their code. They're the ones who are causing the browser, the user's browser. The underlying website is not causing the display. It's a link in the display, and it certainly is liable. But this particular display on the second page of Google and the way it's displayed is caused by Google. They're telling the user's browser where to go to to stay tethered, at least on the top, to Google and to display that image. That's the definition, and we've cited lengthy legislative history, as have the amicus briefs on that, including the photographer's brief. One of which is, any act by which the initial display is transmitted, repeated, or made to recur would itself be a display. That's the House report that we cited. Now, as to Amazon, Your Honor, by the way, Amazon argued that it's not displaying a copy. Of course it's a copy. It's a copy from, there was no dispute about that. It was a copy from an underlying infringing website. It was an infringing copy. It wasn't from Perfect Ten. Here's Amazon's basic problem, I think, Your Honor, in a nutshell, and in a minute and a half, I hope. They are paying Google to do something that they're not doing themselves. You cannot evade liability by paying somebody to do something that is infringing, and then to display by paying those images because they do, and I refer to the court, is another anomaly in the district court's opinion. If the court compares ERG-1030, which are the thumbnails that Google provides, with ERG-A423, you will see that the thumbnails that are displayed by Amazon are essentially exactly the same, not surprising, as those that are displayed by Google, in more or less the same format, except that they put their own logo on it, as are the full-size images. But for the thumbnails, that display by Google is direct infringing. The display by Amazon is not infringing at all, direct or secondarily, even though it's also providing its audience with those images. So I would submit to the court that you cannot avoid the copyright law, either direct or secondary, by simply paying somebody else. And Amazon, as we pointed out in our briefing, if I could end on this, is not a 512A service provider. That's for an Internet backbone. That's for Verizon. They're not an Internet backbone. They're an intermediary here. At the very least, they're an intermediary conveying these infringing images to their consumers in order to get them to buy stuff from Amazon. And I'm sure I've left out a lot of stuff, Your Honor, but I think it's all in our briefs anyway, although I would be happy to answer any other questions that the Court has. Roberts. I don't see any. Thank you very much, Your Honor. Thank you, Your Honor. About a minute and a half. Thank you, Your Honor. I'll be brief. First, I'd like to point out that even if the display right is implicated here, the fair use arguments that Google makes would apply to that as well as to the thumbnails, which we've argued earlier. But because the district court found that the framing of websites did not constitute a display, fair use would be an additional ground to affirm the district court on that. Going back to Mr. Frackman's question, who's causing the display, the question is who is displaying. It's not any link in the console chain. Who is displaying? Google is providing only a link for the framed website to appear. The user must click on that link the same way a user would click on any hyperlink. And then the website must transmit the page to the user. It is the website's display. If the website, if Google's link was outdated, that website would not transmit that page to the user. Google is just providing the index. In that respect, how is that different from Napster? Napster was doing something very different. Napster was actually connecting people, and Google does not actually connect people. Napster actually put them together. Yes, Your Honor. All you do is put up the link. We provide a link, and somebody, the browser has functions that reads links, and upon the user's initiative, the browser fetches. But it's the user-browser combination that acts upon the link, which is the reference Google provides for the browser to summon the website to transmit it to the user. So that is the website's display. And I must say, there is no principled difference between a framing hyperlink and a regular hyperlink. And if a hyperlink becomes a display, the entire structure, and this is not hyperbolic, the structure of Internet regulation, of the fact that it is nothing but a massive collection of links, suddenly every participant in the Internet's system of links gets implicated under the display right, and that is untenable. Just to finish with one thing, Mr. Frackman made the injunction sound innocuous by saying, well, we're just trying to enjoin this. What the district court enjoined, for reasons I do not discuss in open court because they're highly confidential, but they're supported in the highly confidential fifth volume of our excerpts of record, the injunction ordered by the district court would have a drastic effect on Google. It is not trivial. So in conclusion, the district court got many things right in this case. It astutely analyzed the display right as applied to the framing, astutely analyzed the distribution right, the secondary issues. It did make errors in those three ways that I discussed earlier. Those were errors of law because the court found itself acting in contradiction to the leading cases, especially Campbell v. Acuff-Rose, and on that ground, this Court should reverse the district court, vacate the injunction and affirm the rest of the decision. Thank you very much, Your Honor. Thank you. Thank you both for excellent arguments. This is a very difficult case. All of the briefs were very good. The amici were especially good and especially helpful on both sides. And we'll see if we can get it right. We don't know if it will be perfect or not, but we'll try to get it right. Thank you very much. I just pointed out to the Court, because I didn't have a chance to argue it, that this whole issue of hyperlinking and inline linking and framing is addressed in our brief. We understand. Thank you. The case just argued will be submitted for decision, and the Court will stand in recess for the day.
judges: Hall, Hawkins, Ikuta